**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA

    Plaintiff,

        v.                         CIVIL NO.: 15-731 (CCC)

JESÚS EDUARDO ESTERAS-ROSARIO


    Defendant.

## OPINION AND ORDER

**I.    Procedural History**

On November 24, 2015, a grand jury returned a two-count indictment against defendant Jesús Eduardo Esteras-Rosario (hereinafter referred to as "defendant" or "Esteras-Rosario"). ECF No. 10. The indictment alleges that on or about November 19, 2015, the defendant, by means of a deadly or dangerous weapon, a Ford Ranger pickup truck, forcibly assaulted, resisted, opposed, impeded, intimidated, and interfered with Criminal Investigator Deputy United States Marshals, J.W.C. and P.F., persons designated in Title 18, United States Code, Section 1114, while said designees were engaged in the performance of their official duties, all in violation of Title 18, United States Code, Sections 111(a) and (b). A detention hearing was held on November 30, 2015. The government requested defendant's detention, whereas defendant urged the court to follow the recommendations of the Pre-Trial Services Report, namely that defendant be granted conditions of release. At the detention hearing, the court ordered defendant detained on the basis of risk of flight and danger to the community. ECF No. 13.

On December 14, 2015, defendant filed various motions, one of which is a motion requesting reconsideration and vacation of the detention order. ECF Nos. 27; 30. Defendant filed a motion for order on previously filed motions on December 17, 2015. ECF No. 31. On December 17, 2015, the motion for reconsideration was referred for disposition. ECF No. 32. The court filed a written order of detention on December 18, 2015. ECF No. 25. On December 30, 2015, defendant filed a supplemental motion for reconsideration. ECF No. 40. The government filed a response in opposition to both the motion for reconsideration and the supplement on January 12, 2016. ECF No. 45. On January 21, 2016, defendant replied (ECF No. 47) and filed an additional motion requesting that the detention hearing be reopened (ECF No. 48).

A bail review hearing was held on February 11, 2016. Deputy United States Marshal John Coleman ("DUSM Coleman") testified on behalf of the government.[1] Arguments were heard from both sides.

## II.     Pre-Trial Detention

### A.   Danger to the Community

On November 19, 2015, DUSM Coleman and his partner were conducting surveillance in Santurce, Puerto Rico, specifically in the area of Carolina and Diez de Andino streets. The purpose of this surveillance was to locate defendant's father, Eduardo Esteras-Rosado ("Esteras-Rosado"), a federal fugitive in two cases, 11-258 (JAF) (related to money laundering) and 14-726 (ADC) (regarding charges of conspiracy to import controlled substances, conspiracy to possess with intent to distribute controlled substances, and conspiracy to launder monetary instruments). Law enforcement agents spent approximately four years trying to arrest the defendant's father, and, according to the government, the November 19, 2015 incident was not the first time that the

---

[1] The government entered into evidence Exhibit 1, a DVD containing five file folders, each of which in turn contained two files. The government only used at the hearing the files DA-046-F32_2015-11-19_17h37min08s000ms.asf and IV-09(F01)_2015-11-19_17h40min52s000ms.asf.

defendant's father had used other vehicles to impede law enforcement's attempts to execute his arrest.  Hr'g Tr., Nov. 30, at 7:7–18.

The Deputy U.S. Marshals were in a government-owned Ford Explorer ("silver Ford") with DUSM Coleman riding in the front passenger seat and his partner driving. As the government proffered at the original detention hearing, after the defendant and his mother left their residence on that date, they changed vehicles from a white Land Rover to a silver Nissan Pathfinder ("silver Nissan") and arrived at the area under surveillance, where a red Ford Ranger pickup truck ("red pickup") was parked.[2] DUSM Coleman testified that the red pickup was one of the fugitive Esteras-Rosado's known vehicles. Then, as DUSM Coleman confirmed in his testimony, two male individuals were observed getting out of the silver Nissan and into the red pickup. The silver Nissan then left the area with the red pickup following. DUSM Coleman identified defendant as the driver. DUSM Coleman and his partner decided to conduct a "loose follow" to try and ascertain who was in the silver Nissan. The Deputy U.S. Marshals were not interested in the red pickup. The vehicles proceeded with the silver Nissan in the lead, then the red pickup, and lastly the Deputy U.S. Marshals' silver Ford.

The silver Nissan reached the end of Diez de Andino and conducted a right turn onto the Baldorioty feeder road.[3] Shortly thereafter, the red pickup reached the same corner. According to DUSM Coleman the red pickup was slowing down and paused at the corner. Because of the momentary pause, the Deputy U.S. Marshals attempted to go around the red pickup at the corner, but were unsuccessful. As they proceed down the feeder road, the red pickup applied its brakes slowing down the Deputy U.S. Marshals in the silver Ford. To support DUSM Coleman's testimony regarding these events, the government utilized a video recording that shows these

---

[2] Upon his arrest, the defendant admitted the vehicle change.
[3] Also known as the marginal or service road.

events occurring consistent with his testimony. Ex. 1. In an exhibit attached to defendant's supplemental motion for reconsideration, the report of an interview with defendant indicates that defendant applied the brakes on his vehicle "suddenly" in order to "create some distance" between his vehicle and the silver Ford. ECF No. 40-1, at 2. At this time DUSM Coleman acknowledged the emergency lights and sirens of the Deputy U.S. Marshals' silver Ford were not on. Based on what was presented at the bail review hearing, there is no reason to doubt defendant's claim that the first time he hit the brakes, he did not know that those occupying the silver Ford were members of the U.S. Marshal Service.

Eventually the left lane opened up and the Deputy U.S. Marshals were able to pass the red pickup. DUSM Coleman testified that they then placed their vehicle in front of the red pickup and attempted to catch up to the silver Nissan. The traffic then impeded the progress of the silver Nissan and the Deputy U.S. Marshals were able to pull up parallel to it. DUSM Coleman recognized the driver of the silver Nissan as fugitive Esteras-Rosado's wife. At this point the Deputy U.S. Marshals, in consultation with their supervisor, attempted to pull over the silver Nissan. DUSM Coleman testified that they ordered the silver Nissan to stop, but it was able to get away. At that point, DUSM Coleman's partner activated the lights and the siren. These emergency lights, according to DUSM Coleman are blue and "roughly in the area of the taillight … in the back" and "on the front would be the headlights and by the mirror, the center mirror." Hr'g, Feb. 11, at 11:11 AM. The red pickup truck was somewhere behind the Deputy U.S. Marshals at that time. The silver Nissan did not pull over, but rather accelerated and began driving erratically.

The Deputy U.S. Marshals were able to again pull up parallel to the silver Nissan. With windows down, DUSM Coleman ordered the driver to pull over in English, while his partner did the same in Spanish. DUSM Coleman had a rifle at the ready, but not pointed at the driver of the

silver Nissan; however, defense counsel acknowledged both at the original detention hearing and at the bail review hearing that defendant was unaware of this.[4] Hr'g Tr., Nov. 30, at 47:10–11; Hr'g, Feb. 11, at 11:44 AM. Traffic then cleared, according to DUSM Coleman, and the silver Nissan exited the lane of travel and accelerated.[5] The government contends that defendant, driving the red pickup, at that time pulled in front of the Deputy U.S. Marshals' silver Ford and intentionally hit the brakes causing a collision. Hr'g Tr., Nov. 30, at 5:22–6:7. DUSM Coleman admitted that, because he was focused on the silver Nissan, he was not paying attention to the red pickup until the impact. Importantly, however, DUSM Coleman testified that when the collision occurred, their emergency lights and sirens were on. The report of defendant's interview states that defendant drove passed the silver Ford, got in front of it, and then "slammed on the brakes to stop [it]." ECF No. 40-1, at 2. Therefore, defendant had reason to know the vehicle belonged to a law enforcement agency at the time that he intentionally hit the brakes for the purpose of stopping the silver Ford.

Defendant and the silver Nissan then both accelerated away at a high rate of speed. DUSM Coleman testified that they tried to pursue, but were unable to because they feared endangering the other vehicles on the road. The Deputy U.S. Marshal driving the silver Ford then turned off the lights and sirens and ceased pursuit. DUSM Coleman was able to identify this moment at the bail review hearing using Exhibit 1, which shows their lights were on when they entered the frame at 5:41:02 PM, but were then turned off at 5:41:05 PM when they ended their pursuit.

---

[4] Defendant argues that the omission of reference to the rifle in DUSM Coleman's U.S. Marshals report of the incident should cast doubt on his credibility. However, DUSM Coleman testified that the rifle is a tool of his trade, which is unsurprising in the context of apprehending fugitives.

[5] At this time the Deputy U.S. Marshals had their emergency lights and sirens on and were ordering the driver of the silver Nissan—the mother of defendant and wife of fugitive Esteras-Rosado—to pull over. Despite having reason to believe that law enforcement officers were attempting to intervene with her, she fled.

Defendant argued both at the first detention hearing and at the bail review hearing that at the time of the events in controversy he did not know that the occupants of the unmarked silver Ford were Deputy U.S. Marshals. The Ford Explorer, the defendant claims, had tinted windows without any siren or blue lights on. If anything, defendant alleges, he was merely trying to protect his mother, in the silver Nissan, from unknown strangers in the silver Ford.  Prior to the bail review hearing, defendant argued that the silver Ford's emergency lights were never on. He made this argument first at the detention hearing: "There are no sirens, there are no flashing blue lights, flashing white lights. None of that ever happened, Your Honor." Hr'g Tr., Nov. 30, at 46:16–18. The argument was again made in the motion for reconsideration: "No Sirens were blaring. No lights were flashing." ECF No. 27, at 18. At the bail review hearing, defendant argued that it cannot be known with certainty and there was reason to doubt that the lights were on at the critical time. Admittedly, the key moment of the collision is not captured on any of the video files provided to the court. This is not alone sufficient, however, to warrant a negative inference. Rather, the government affirmed it requested officers get any available video footage from Puerto Rico Police Department traffic cameras and nearby business, but that any video of the collision was not in its possession. Further, defendant conceded that he did not actually have reason to believe that such a video exists.

Based on the proffers made at the detention hearing and the testimony of DUSM Coleman at the bail review hearing, it cannot be categorically stated that then fugitive Esteras-Rosado was indeed inside the silver Nissan on November 19, 2015. In fact, the government conceded at the initial detention hearing that "we cannot pinpoint at this time the father was the person that was laying back in the seat...." Hr'g Tr., Nov. 20, at 7:1–3.[6] Yet, although the circumstances perhaps

---

[6] At another point, however, the government – without explanation – argued that "[t]his defendant knows his father is in that vehicle." Hr'g Tr., Nov. 20, at 29:6–8.

fall short of showing that there was probable cause to believe that a fugitive was in the Nissan Pathfinder, at a minimum they lay the foundation for reasonable suspicion. Further, the charged crime here does not require either that the father was in the silver Nissan or that defendant knew or had reason to believe his father was in the silver Nissan. Rather the charge requires that defendant forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with the Deputy U.S. Marshals while they were engaged in or on account of the performance of their official duties.[7] 18 U.S.C. § 111.

The weight of the evidence still suggests that without justification the defendant interfered with the performance of various agents' duties, placing said agents' safety in a very vulnerable position.[8] Certainty or beyond a reasonable doubt are not the standards here. The court finds by clear and convincing evidence that based on the nature of the charged crime, taking into consideration the weight of the evidence at the moment, defendant presents a danger to the community and that no condition or combination of conditions can assuage this concern. Defendant, when met with the authority of the United States Marshals Service, chose not to acquiesce to that authority, but rather to actively confront it and, in so doing, endangered the lives of the Deputy U.S. Marshals in the silver Ford and of his own passenger.

B.  Risk of Flight

Defendant is nineteen years old, was born in Puerto Rico, and has been residing in the Municipality of Carolina at the address of record for the past eight years. He has family ties to Puerto Rico. He is currently a student at Universidad Politécnica and is eager to continue his studies. Defendant has no prior convictions and has never had any prior encounters with the law.

---

[7] Defendant did not raise again at the bail review hearing the argument that the actual damage suffered by the silver Ford was minor. To the extent that argument is still alive, it has no relevance to the charged conduct or to the seriousness of the danger that defendant created by intentionally slamming the breaks. See ECF No. 36, at 4.

[8] This charge carries with it a heavier potential penalty than, for example, base-level carjacking (18 U.S.C. § 2119(1)) or possessing a machine gun (18 U.S.C. § 922(o), 924(a)(2)).

Despite defendant's experimentation with marijuana when he was eighteen years old, the urinalysis performed on November 20, 2015, yielded negative to the use of controlled substances.

The court nonetheless found at the detention hearing, and further articulated in the order of detention, that defendant presented a risk of flight. Defendant is currently facing a charge for which he could serve a maximum of twenty years imprisonment. 18 U.S.C. § 111. Moreover, after the red pickup being driven by defendant and the silver Ford driven by a Deputy U.S. Marshal collided, the defendant chose to leave the scene, despite the fact that the lights and siren were on. Defendant argues that there is no risk of flight because eventually he was arrested at his residence, which is inconsistent with a genuine attempt to evade authorities.

An additional concern here was that the defendant's father, who was charged with money laundering and importation of 800 kilogram loads of cocaine, would use his financial resources and international contacts gained from these dealings in international drug trafficking to aid his son in fleeing Puerto Rico.  At the time of the detention hearing, defendant's father was still at large, but before the written order of detention was filed he was apprehended. The court noted that this "significantly weakened" the government's argument for risk of flight. ECF No. 36, at 6. In the intervening time between the original detention hearing and today, Esteras-Rosado has been detained pending trial. 3:14-cr-00726-ADC-10, at ECF No. 481. Furthermore, since the detention hearing, defendant has also supplied letters of support attached to defendant's motion for reconsideration.[9] ECF No. 27-2; 27-3. At the bail review hearing, defendant further presented evidence of community support. In addition, at the bail review hearing, defendant alerted to the court a property with sufficient equity to support a $25,000 secured bail amount. Defendant also brought a pastor from defendant's church who would be willing to serve as a third party custodian. These developments are sufficient to tip the balance on behalf of defendant. Therefore, the

---

[9] A certified translation of these letters shall be filed by February 29, 2016.

defendant is no longer considered, given the evidence as currently presented, a risk of flight by preponderance of the evidence to the extent that no combination of conditions could be fashion to address this concern.

## III.   Conduct of Defense Counsel

The court feels compelled to address the lack of professionalism displayed by the pleadings of defense counsel. Local Rule 83E(a) requires that attorneys practicing before the Court comply with the Model Rules of Professional Conduct, adopted by the American Bar Association. The preamble to these Rules establishes the foundational expectation that all attorneys "demonstrate respect for the legal system and for those who serve it, including . . . other lawyers" and to "maintain[] a professional, courteous and civil attitude toward all persons involved in the legal system." Model Rules of Prof'l Conduct pmbl. ¶¶ 5, 9.  As the Supreme Court stated:

> All persons involved in the judicial process—judges, litigants, witnesses, and court officers—owe a duty of courtesy to all other participants. The necessity for civility in the inherently contentious setting of the adversary process suggests that members of the bar cast criticisms of the system in a professional and civil tone.

In re Snyder, 472 U.S. 634, 647 (1985). "The license granted," the Supreme Court continues, "requires members of the bar to conduct themselves in a manner compatible with the role of courts in the administration of justice." Id., at 645.

In her motion for reconsideration, counsel casts aspersions on the Deputy United States Marshals, counsel for government, and the court. She referred to the Deputy U.S. Marshals in the silver Ford as "thugs" and stated that they acted "exactly like delinquent felons." ECF No. 27, at 5. Regarding counsel for the government, defense counsel stated that "the government deliberately deceived the court on two occasions by withholding crucial information and by improperly and illegally suggesting that the defendant knew that his father was in the Pathfinder car driven by his

mother."[10] Id. at 2. She further insisted that the original detention hearing was "premised on false and deceptive arguments and constituted a transparent measure of the government's frustration at not having been able to arrest the defendant's fugitive father …." Id. at 1. The court noted in the original order of detention, that government counsel did make statements that were in tension with each other at the detention hearing regarding the presence of defendant's father in the silver Nissan. ECF No. 36, at 5. Given that both versions are on the record, however, defense counsel needs more than such statements to show a good faith basis to believe that either statement by the government was a purposeful deception—even more so were this involves inquiring into what was, at that point, an active fugitive investigation.[11] Defense counsel also points to the omission of DUSM Coleman's rifle from government's proffer, but again fails to show a good faith basis that this was an intentional action by government's counsel to deceive the court particularly as defendant himself did not see the weapon.

---

[10] Counsel similarly insinuates in defendant's reply that counsel for the government is intentionally withholding video footage of the moment of the crash:

> The court is entitled to legitimately inquire why it is that the government was able to obtain and produce videos of the incident before the collision that underlies this indictment and after the collision, but not videos of the collision. Did the government request them? Were they produced? Are they in the government's possession? If so, did the government elect not to present them to defendant and the court because they contradict its oral proffer and corroborate defendant's proffer?

ECF No. 47, at 3. She repeated similar allegations at the bail review hearing:

> I find it disturbing but possibly explicable… the fact that the most important video, the one the court needed to see ideally, that is not available. Mr. Cardona and the agents have marshalled virtually every item of evidence except the most important one and I think the court can treat that authentically with legitimate skepticism.

Hr'g, Feb. 11, at 11:14 AM. Counsel then conceded that she did not even know if such a video existed, but despite this concession, she continued: "The court should treat that missing segment of DVD with great suspicion." Id., at 11:46 AM.

[11] Nor has government counsel been alone in making statements that are in tension with each other over the course of this case. Defense counsel stated at the detention hearing, "[defendant] suffered a week in jail. He has been so depressed and acting this way at MDC that he was moved to SHU because they were concerned about him, not because he was violating any of the MDC's rules." Hr'g Tr., Nov. 30, at 44:12–16. But in her motion for reconsideration stated, without explanation for the change, "The government requested that he be placed in SHU, an isolation unit in order to pressure his father to turn himself in." ECF No. 27, at 2; see also ECF No. 31 ("Moreover, the government has requested that this young man be incarcerated in SHU for no legitimate reason except to pressure his fugitive father."); ECF No. 47 ("MDC officials were advised to place Mr. Esteras in the more secure SHU Unit because Mr. Cardona advised MDC officials that he was concerned that his father was a fugitive.")

Regarding the court, defense counsel first alleges that defendant's "detention is not legitimate but strategic." Id. at 1. In relation to the order of detention's silence regarding the allegations with respect to the rifle, defense counsel states: "The only explanation for the court's silence is that the court completely discarded it simply because it was part of the defendant's proffer and not part of the United States' proffer, a presumption or bias inconsistent with the Bail Reform Act." Id. at 6. Defense counsel goes on to state that, "[t]he government spent so much time talking about defendant's father in order to pollute the record and to raise the court's prejudice against the defendant that the court was required to stop the government and to remind it that it was beginning to 'stray' from relevant matters. Unfortunately, the court had already indulged the government far too much." Id. at 8–9. Lastly, in regards to the possibility that defendant's father could assist defendant in flight, counsel states:

> The argument was sheer nonsense but unfortunately the court bought it. Although there was absolutely no basis in fact, and there was, as the defense argued, a long record by which to measure the plausibility and probability of such a fantastical allegation, the court rejected logic and opted for illusory findings.

Id. at 9.[12]

Counsel's behavior here is not an isolated incident. Counsel Sandoval has at least twice been reprimanded in the U.S. District Court for the District of Puerto Rico for failing to meet the requisite standards of professionalism. Counsel Sandoval was first admonished for vexatious litigation, at which time the court stated that "attorney Sandoval's judgment was clouded by her excessive zeal to the point that her performance became unlawyerly." Cruz v. Savage, 691 F.Supp. 549, 556 (D.P.R. 1988). The court there imposed a sanction in the amount of $3,000. Counsel

---

[12] Counsel Sandoval's unwarranted hyperbolic tone is also present in the motion filed on December 17, 2015 (e.g., "the U.S. Attorney's Office and the FBI deliberately deceived the court in a serious material fashion in order to illegally obtain the detention order."). ECF No. 31, at 3. Allegations such as these should not be made lightly or without well-grounded evidence to support them. With respect to Counsel Sandoval's allegations in the motion filed on December 17, 2016, the undersigned has never had a policy of always requiring attorneys to call court staff to notify that a motion has been or will be filed. Furthermore, regarding the undersigned, the court repeats again what was previously stated in the original detention order. ECF No. 36, at 7 n.4.

Sandoval was next censured for "inappropriately accusing [government's counsel] and the rest of the U.S. Attorney's Office of conducting witch hunt and malicious prosecution." United States v. Dubon-Otero, 98 F. Supp. 2d 187, 192 (D.P.R. 2000). The court also noted "accusations of bias directed at this court," but stated that, in light of counsel's apology, this behavior warranted only a "firm warning." Id. A few statements of the court bear repeating:

> We expect and demand that attorneys at all times comport themselves with the utmost integrity, befitting an officer of this court. Ms. Sandoval must remember that zealous advocacy does not entail personal attacks against opposing counsel or groundless vituperation against the U.S. Attorney's Office or the trial court. Accordingly, Ms. Sandoval must attain and respect the high level of professionalism practiced in this court if she plans to continue to appear before us. We will tolerate nothing less.

Id. The court continued by stating:

> Ms. Sandoval's actions are censured. She is ordered to recommit herself fully to abide by the Local Rules of this Court and norms of civility and collegiality, and adopt a more civil and respectful posture towards this court and all the members of its Bar. She should, therefore, consider herself forewarned that our patience has been exhausted and that we will address future transgressions with the severest of possible sanctions.

Id. at 193.

Counsel Sandoval is entitled to disagree with both the government and the findings of this court and to zealously advocate for her client. However, zealous advocacy is at all times bounded by the requirements of civility and professionalism. The rhetoric used in this case is unnecessary and unacceptable in the context of effective advocacy. Defense counsel has needlessly lacerated the professional environment. In the future, defense counsel is expected to maintain the level of civility and professionalism required in all interactions with the court and opposing counsel. Counsel Sandoval is admonished that, should she engage in such conduct again, sanctions may be imposed.

**IV.     CONCLUSION**

Defendant's motion for reconsideration (ECF No. 27) is thereby GRANTED IN PART and DENIED IN PART. Defendant shall remain detained pending trial in light of the finding that there is no condition or combination of conditions that can reasonably assure the community's safety.

IT IS SO ORDERED

In San Juan, Puerto Rico, this 16th of February, 2016.

s/Marcos E. López
U.S. Magistrate Judge